**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEIDRE CHAPMAN, *Plaintiff*, v. THE NEW YORK TIMES COMPANY and JOHN OTIS, *Defendants*. | **INDEX # 16-cv-9007 ( )** **COMPLAINT** **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. This is a defamation action brought by the Plaintiff, Deidre Chapman, a private figure, against the Defendants, The New York Times Company, publisher of *The New York Times*, and its reporter, John Otis, arising from an article published in the "Neediest Cases" section of *The New York Times* on December 3, 2015, under the headline: *After Homelessness and Jail, Finding Stability in a New Career*. The article was also published in an online version under the headline: *After Homelessness and Jail, a Harlem Woman Finds Stability Working Construction.* The article was disseminated globally by the New York Times Company through the internet, and in print via its wholly-owned publication, the *International New York Times*.

## JURISDICTION AND VENUE

2. Deidre Chapman is a citizen of New Jersey. The New York Times Company is a New York Corporation formed under the laws of the State of New York and registered as a Domestic Business Corporation with the New York Department of State, with its principal offices located at 620 Eighth Avenue, New York, New York. John Otis is a citizen of New York currently residing as a foreign journalist in Columbia and whose principal place of employment is located at 620

Eighth Avenue, New York, New York. The amount in controversy exceeds $75,000, exclusive of interest and costs. This Court thus has diversity jurisdiction under 28 U.S.C. § 1332.

3. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391.

**THE DEFAMATORY ARTICLES**

4. The original print version of the defamatory Article appeared in the print edition of *The New York Times* on December 3, 2015, on page A32. The Article also appeared, beginning on December 2, 2015, in the online edition of *The New York Times*, and in that online version, was subsequently revised in at least one significant respect, during that same month of December, 2015, at an exact date and time – and under circumstances – not currently known to Chapman. While changes in the text, captions, and headlines of the Article may be probative of issues relating to defamatory meaning, falsity, and fault, for the purposes of this Complaint the various versions of the articles published by *The New York Times* are for convenience generally and collectively referred to in this Complaint as "the Article."

5. The Article tells the story of Milan Chapman, a 22-year-old woman at the time of publication, who is depicted as having been abused by her mother, the Plaintiff Deidre Chapman, as having been kicked out of her home at a young age by her mother. The Article describes Milan Chapman as a girl made homeless as the result of her mother Deidre Chapman's abuse and rejection. Milan is portrayed as turning to alcohol, drug abuse, drug dealing, prostitution and burglary as a result of being made homeless by her mother's conduct. Because of this asserted abuse and rejection by her mother, Milan is depicted as eventually ending up in jail on Rikers Island. Milan is depicted as stoic and courageous, able to overcome her mother's abuse and abandonment, free herself of her addictions, and reject crime, starting a new life after prison and job training as a construction worker.

6. The Article is false and defamatory in its overall portrayal of Deidre Chapman as an

abusive, cruel, and heartless mother who kicked her child out of her house, leaving her homeless, destitute, and desperate – so desperate as to turn to drugs, alcohol, prostitution and crime. The Article is also false and defamatory in many of its particulars. This defamation action is predicated both on what the Article communicates as a whole, including its headlines, photographs, and captions, and on the numerous specific defamatory statements, of and concerning the Plaintiff Deidre Chapman, contained within the Article.

7. The original text of the Article read in its entirety as follows:

> One of the worst things about being homeless was getting caught in the rain.
>
> Milan Chapman, 22, who was sometimes drenched for weeks at a time, said of her time on the street, "Just wet, always wet."
>
> To numb herself from the elements and from her own gloomy mood, Ms. Chapman once relied on alcohol and drugs, she said.
>
> "I was doing anything," she said. "I was basically a junk box."
>
> Ms. Chapman wound up on the streets at a young age after her mother kicked her out of her home in North Bergen, N.J. That was the culmination of years of abusive behavior by her mother, Ms. Chapman said. During those same years, she saw her father slowly deteriorate from multiple sclerosis. He died in 2013.
>
> Initially, Ms. Chapman saw homelessness as liberating.
>
> "I was so naïve, oblivious to life," she said. "When she kicked me out, I felt relieved that I didn't have to deal with her misery."
>
> Ms. Chapman did not know about resources for homeless youths. She had very few friends to ask for help; her father lived in Coxsackie, N.Y., at the time with her uncle.
>
> "When you're outside, you're just running to anything, which is the dangerous part about it," she said. "You don't know who you're meeting."
>
> Ms. Chapman forged temporary bonds with people who slept beside her under trees or on park benches. Other times, she offered sexual favors to men who offered her short-term shelter in their homes. To survive, she stole food and began selling drugs.
>
> "I feel really ashamed because I just did a lot of things I wish I never did, and I'm pretty sure I hurt a lot of people," Ms. Chapman said.

In late 2013, she moved into Covenant House, a shelter for homeless youths, and began curbing her drug use. Things did not improve. In May 2014, Ms. Chapman was charged with burglary and spent 10 months at the Rikers Island jail complex.

"What possesses me to do that?" she asked. "It was like I was standing outside of myself, watching a movie — a horror movie, basically."

In jail, Ms. Chapman decided to make serious changes to her life. She stopped doing drugs. She met a yoga instructor who encouraged her to reignite a passion for art. Ms. Chapman had loved to draw until something happened when she was 13.

"I don't know what I did to my mother," she said. "She came into my room and ripped my whole portfolio to shreds. I would still draw pictures, but I would give them to people. I haven't drawn for myself until lately."

After her release from Rikers in February, Ms. Chapman went to Greenhope Services for Women, a nonprofit organization that houses female ex-convicts and works to reintroduce them to society.

"I wasted a whole 10 months of my life and I never want to put myself in a situation like that again," she said. "I have to make plans and goals and follow what I need to follow."

The first of those pursuits was finding a construction job, which she believed could one day lead to a career as a commercial painter. She completed a 12-week job training program at the Fortune Society, a nonprofit group dedicated to helping ex-convicts. The Community Service Society of New York, one of the organizations supported by The New York Times Neediest Cases Fund, gave Ms. Chapman $357 to pay for three monthly MetroCards, which allowed her to get to the job training programs.

Ms. Chapman also completed an Occupational Safety and Health Administration program and received a certification to work on scaffolding. In September, she took a job at a construction site in Manhattan, where she is developing a love of the work, and is now considering a future in the field. She wants to join a union and attend trade school.

Over three years have passed since she spoke to her mother. She said she misses her 18-year-old brother; she also has not spoken to him in three years. Photographs exist of her family in happier times, but Ms. Chapman does not have any of them, nor does she have any mementos of her beloved father.

"Memories are all I've got," she said.

Ms. Chapman, who now lives in housing provided by Greenhope in Harlem, said that one reason she has so readily embraced her newfound career is that she has lost

so much.

"I don't want my whole life to crumble apart to where I have nothing," she said. "I need to see progression."

8. A photograph accompanying the original Article showed a picture of Milan Chapman. Underneath that photograph the caption read: "Milan Chapman wound up on the streets at a young age when her mother kicked her out of her home. Years later a new career is expanding her future."

9. The text of the original Article was later revised to delete the phrase "at a young age" and to substitute a different phrasing. The revised article and caption stated that Milan Chapman was kicked out of her home "in 2012."

## THE DEFAMATORY STATEMENTS

10. The Article communicates many false and defamatory statements "of and concerning" Deidre Chapman. While the Article does not name Deidre Chapman by name, she is unmistakably identified as the mother of Milan Chapman, who lives in North Bergen, New Jersey, the family's hometown. Bergen is a small town, where Deidre Chapman, who is most commonly known by her nickname "Mignon" Chapman, and her 18-year-old son, also referred to in the Article, both reside. Deidre Chapman's son, Milan Chapman's brother, is Sifiso Chapman.

11. The principal defamatory "gist and sting" of the Article resides its overall portrayal of Deidre Chapman as a cruel and abusive mother who kicked her child out of her home rendering her homeless, abandoned, and destitute at an early age.

12. The Article thus stated that "Ms. Chapman ended up on the street at a young age after her mother kicked her out of her home in North Bergen, N.J. That was the culmination of years of abusive behavior by her mother. . ." The Article stated: "'I don't know what I did to my mother,' she said. 'She came into my room and ripped my whole portfolio to shreds. I would still draw pictures, but I would give them to people. I haven't drawn for myself until lately.'" The Article

continued: "Over three years have passed since she spoke to her mother. She said she misses her 18-year-old brother; she also has not spoken to him in three years. Photographs exist of her family in happier times, but Ms. Chapman does not have any of them, nor does she have any mementos of her beloved father." The Article's photograph caption read: "Milan Chapman wound up on the streets at a young age when her mother kicked her out of her home. Years later a new career is expanding her future."

13. These passages in the Article, and its entire communicative meaning, are defamatory *per se*. The defamatory meaning conveyed by the Article is as plain as language can be, requiring no aid of extrinsic facts or implication to discern its meaning.

14. In publishing false and defamatory statements of fact made by Milan Chapman, *The New York Times* and John Otis, as a matter of law, adopted those statements as their own, and those statements are actionable directly against The New York Times Company and John Otis.

15. While as a matter of law the repetition of Milan Chapman's allegations is attributed to *The New York Times* and John Otis, the Article went beyond that simple repetition. *The New York Times* did more than merely communicate to the world Milan Chapman's devastating allegations against Deidre Chapman. Reasonable average readers of *The New York Times* would not construe the Article as intended to convey a fictional story, or as an expression of opinion, or as a narrative that *The New York Times* and John Otis were merely presenting as Milan Chapman's version of events, a version not endorsed or ratified by the publisher and author. Rather, in addition to publishing and adopting the false and defamatory allegations of Milan Chapman, the Article in its overall tenor, and in many of its specific statements, clearly communicated in the voice of *The New York Times* itself and the voice of its reporter John Otis the false defamatory factual assertions that Deidre Chapman was abusive and that she kicked her daughter out of her home at a young age, condemning her to a life of homelessness, substance abuse, thievery, and drug-dealing. The Article

flatly stated, for example, with no reservation or equivocation, that "Ms. Chapman ended up on the street in at a young age after her mother kicked her out of her home in North Bergen, N.J." Similarly, the Article's photograph caption stated, in the clear voice of the *New York Times* itself, that: "Milan Chapman wound up on the streets at a young age when her mother kicked her out of her home." The Article describes Milan's horrible plight as the "culmination of years of abusive behavior by her mother."

## FALSITY

16. The Article is false in its overall defamatory portrayal of Deidre Chapman as a cruel and abusive mother who ejected her child from her home and rendered her homeless and destitute. The Article is also false and defamatory in many of its specific details.

17. Deidre Chapman never abused Milan Chapman. Deidre Chapman was a loving, attentive, and caring mother to both her daughter Milan Chapman and her son Sifiso Chapman.

19. Milan Chapman was never kicked out or expelled from the Chapman home by her mother Deidre Chapman. Milan Chapman was not expelled at a young age, an early age, or in 2012, as the Article communicates.

20. In 2007, at the age of 14, Milan Chapman did run away from home. Milan ran away after having stolen $10,000 from the joint bank account of Milan's mother and father. When Milan Chapman ran away from home, Deidre Chapman worked day and night with law enforcement, led by Bloomfield, New Jersey, Police Department Detective Steve Gherhauser, to attempt to find Milan. Milan was located in a very compromising situation with an older man. She thereafter returned to live in Deidre Chapman's home and the older man was prosecuted and convicted of child abuse. Milan's mother Diedre Chapman actively supported that criminal prosecution.

21. Deidre Chapman never expelled Milan Chapman from her home at a young age, or in any other way left Milan Chapman homeless or destitute. To the contrary, Milan Chapman lived a

privileged lifestyle. She was sent to expensive private schools and was often transported by a chauffeur in a hired Town Car. Unfortunately, she was expelled from all three private schools at which she was enrolled, on such charges as bullying, fighting, and engaging in threats. She attended Harvey Boarding School, at a cost of $48,000 per year. She attended Storm King Preparatory School. Milan, however, was constantly and repeatedly in disciplinary and academic trouble at school. At one point she had an affair with a man and contracted the Herpes virus a result. When at Harvey Boarding School, after a brief period of success, Milan behaved in manner that was disruptive, going so far as to threaten to burn the school down. She was expelled from the school. When Milan was at Storm King Preparatory School, Deidre Chapman worked with teachers and counselors to attempt to help Milan achieve success. Deidre Chapman hired a music tutor for Milan to provide singing lessons. Deidre Chapman hired a drum teacher to provide Milan with drum lessons. Deidre Chapman helped Milan attempt to succeed in the entertainment business, through introductions to Missy Elliott's Camp, and Wyclef's Studio, and entertainers Puffy and BadBoy.

22. Yet again, at Storm King Preparatory, Milan was plagued with academic and disciplinary troubles. A parent of another student at Storm King threatened to withdraw the student if Milan was allowed to remain in the School, accusing Milan of bullying and stalking. Eventually Milan was expelled yet again, this time from Storm King, on charges of threatening, stalking, and bullying.

23. In May 2012, in an effort to assist Milan financially, Deidre Chapman purchased for Milan a business franchise, "MyplusLingerie," in hopes that Milan could run the business for her financial benefit and corresponding growth in taking responsibility for her own life. The purchase of this business cost Deidre Chapman $65,000. Deidre Chapman also worked on acquiring for Milan a "Milan Pelar" lingerie line during this period.

24. During Milan's troubled teen-age years, Deidre Chapman was coping with nursing a dying

husband, and ultimately with coping with his death. Deidre Chapman also faced the severe stress of her own medical problems, surviving Sepsis, and fighting Lupus/fibromyalgia/CFS, a condition that often rendered her bedridden. During this period Milan continued her longstanding habit of stealing money from her mother's bank account. When, in 2012, Milan emptied one of her mother's bank accounts, Deidre Chapman, exasperated, told Milan that she should move out and find another place to live. This "last straw" crossroads in the relationship between Deidre Chapman and Milan Chapman did not occur at an "young age," but when Milan was 19 years old. Nor did Deidre Chapman kick her daughter out of their home. Diedre Chapman simply told Milan that she could no longer live with her thefts and that she needed to find other living arrangements if she could not immediately commit to reform herself. There was no immediate expulsion threatened or accomplished. Indeed, far from being heartlessly ejected and left to her own devices on the street as a homeless person, Milan had immediately taken up residence with a girlfriend, even returning to the house with her friend, in her friend's car, to pick up all her clothes and other valuables. Milan was happy to escape from the normal and reasonable restrictions her mother Diedre Chapman had placed on a recalcitrant and defiant daughter. Milan was pleased to be out from under the age-appropriate curfews and reasonable parental oversight of her partying habits and the friends she kept. As the relationship between Diedre Chapman and her daughter Milan deteriorated, Deidra Chapman sent to Milan numerous text messages and left numerous voicemail messages begging Milan to return home. Diedre Chapman's son Sifiso similarly begged his sister Milan to return. Sick, bed-ridden, and exhausted, Deidra Chapman heeded the advice of her son to attend to her own health and rest. Milan, in the meantime, seemed to be flourishing without the social constraints and the curfews that had been imposed by her diligent and protective mother.

25. When Milan obtained a driver's license, her father offered to have her drive to his residence in upstate New York to live with him. Milan refused, claiming that upstate was boring

and asserting that she had a place to live.

26. Throughout Milan's troubled adolescence, Milan was not destitute or homeless, contrary to the false portrayal in the Article. While Milan was living at home she was lavished with expensive clothes, computers, a driver with a Town Car, psychological counselors, tutors, and expensive private schools. Diedre Chapman paid for these privileges, such as private tutors, out of her own resources without assistance from family members. Diedre Chapman was able to introduce her daughter Milan to highly successful people for inspiration as role models, including Condoleezza Rice and Nelson Mandela. And even after Milan was supposedly kicked out of her home, and allegedly living as a "homeless" person, she was still being taken care of by her mother. For example, beginning in the fall of 2012 Milan matriculated at two different colleges. Milan unfortunately dropped out of both institutions. Milan's years of alleged "homelessness" also included periods when she held down paying jobs, often with her mother Diedre's intercession and assistance. During this time Milan accumulated numerous driving and other citations, which were sent to her address at Diedre Chapman's home, where they were left unattended to and unpaid. During this period Milan remained on and was using her mother's health insurance to buy prescription drugs.

27. The specific anecdote related by John Otis and *The New York Times* to give detail and supposed verisimilitude to the false portraiture of Deidre Chapman as a cruel and abusive mother never happened. Deidre Chapman never entered Milan Chapman's room, as the Article claims, and ripped Milan Chapman's entire art portfolio to shreds. To the contrary, over the years that Milan was living at home, her mother was constantly searching for ways to support and promote Milan's artistic endeavors, including placing her in expensive private schools that emphasized the arts, enrolling her in other extracurricular programs, and generally supporting and advancing her artistic endeavors.

**FAULT**

28. John Otis and *The New York Times* published the Article with negligence, with gross irresponsibility, and with actual malice. John Otis and *The New York Times* knew that they were publishing a devastating portrait of Deidre Chapman as an abusive mother who kicked her child out of her home at a young age, relegating her to squalor and crime. Yet John Otis and *The New York Times* never contacted Deidre Chapman prior to publishing this devastating story. Nor did John Otis or *The New York Times* contact any other family members, friends, neighbors, social workers, police officials, or school officials who knew the Chapmans, prior to publication of the Article. Had Deidre Chapman, or other family members, friends, neighbors, school officials, social workers, police, or any other source or witness to the actual circumstances and events of Milan Chapman's troubled teenage years and to Deidre Chapman's diligent efforts to help her daughter been contacted, the story would have collapsed and imploded. Had there been even a scintilla of attempted verification, the story published by John Otis and *The New York Times* would readily have been exposed as a complete fabrication. Yet John Otis and *The New York Times* deliberately avoided the truth, publishing their false and sensationalist claims, based solely on the accusations of a single, manifestly biased and unreliable source with no credible attempt at corroboration. This was not a case in which journalists relied on a dependable or reputable news source. This was a case in which the only source of the story was the putative victim, in which attempted verification of basic facts would have been simple, and in which reasons to doubt the credibility and reliability of the source were manifest and known. To publish in this manner was not mere negligence, it was grossly irresponsible—publishing without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties. Beyond gross irresponsibility, to publish in these circumstances was to publish after recklessly and deliberately turning a blind eye to any effort to determine the truth. Such intentional avoidance of the truth in

fear that investigation will derail an irresistible story is actual malice, publishing with reckless disregard for truth or falsity. The gross irresponsibility and actual malice with which John Otis and *The New York Times* acted was reinforced and exacerbated when John Otis and *The New York Times* refused to retract and take down the offending story even after being contacted by Diedre Chapman on December 14, 2015, providing them with information regarding the true facts. To the date of this Complaint John Otis and *The New York Times* have taken no action to correct, retract or apologize for their false and defamatory publications—despite the detailed, conclusive proof of falsity offered and available to John Otis and his editors at *The New York Times* by Diedre Chapman.

**AS AND FOR A FIRST CAUSE OF ACTION FOR LIBEL AGAINST ALL DEFENDANTS**

29. Plaintiff repeats and re-alleges paragraphs 1 through 28 of this complaint, inclusive, as if fully set forth herein.

30. On or about December 3, 2015, defendants, wrongfully and with actual malice and gross negligence, caused to be published the statements set forth above. The defamatory statements were libel *per se*.

31. Deidre Chapman seeks recovery of special damages, actual damages, presumed damages, and punitive damages.

32. Diedre Chapman incurred medical expenses for medical conditions proximately caused by the trauma and distress caused by publication of the Article, including treatment under the general supervision of Dr. Lydia Shajenko, M.D., Ph.D., and various other medical providers. Diedre Chapman also incurred lost profits and business disruption costs caused by the disruption of her business as a result of the trauma and distress caused by publication of the Article.

33. Deidre Chapman has suffered actual damages in the form of severe internal emotional

distress and anguish, substantial damage to her mental and physical health and well-being, overwhelming damage to her external reputation, and devastating damage to her family, personal, community, civic and business relationships in New Jersey, New York, her former residence of South Africa, and elsewhere. Diedre Chapman and her son Sifiso suffered abusive behavior and threats from persons in their neighborhood and community as a result of the *New York Times* publication. Diedre Chapman suffered an ischemic stroke and a seizure immediately after the *New York Times* article was published, attributable to the shock she sustained because of the publication. In addition to the highly offensive and defamatory portrayal of Diedre Chapman as a cruel and abusive mother, Deidre Chapman was insulted and outraged by the gratuitous profiling and stereotyping engaged in by John Otis and *The New York Times*, including their appeal to the *noblesse oblige* of prospective donors through a caricature portraiture of Diedre Chapman that was utterly ungrounded in corroboration or fact, to Diedre Chapman's intense distress and embarrassment. Through its cruel and cynical exploitation of the reputation of Diedre Chapman, John Otis and *The New York Times* sought to advance its "Neediest Cases" annual corporate fundraising campaign. To raise money for neediest cases is admirable. To fabricate a neediest case and exploit that fabrication through destruction of an innocent person's reputation is unconscionable.

34. As additional relief, upon a final judgment of liability for defamation, Diedre Chapman seeks injunctive relief ordering the removal of the defamatory material in the offending article from the online posting on *The New York Times* website.

35. By reason of this defamation, plaintiff suffered physical injury, the expense of medical services and therapeutic services in excess of one-hundred thousand ($100,000.00) dollars, and lost wages in excess of in excess of one-hundred thousand ($100,000.00) dollars, all of which comprise special damages arising directly from the acts of defendants. Additionally, plaintiff was greatly

injured in her character and reputation, suffered abuse and harassment as well as great pain and mental anguish comprising actual, compensatory and presumed damages in an amount to be determined by the Court but in an amount no less that ten-million (10,000,000.00) dollars.

36. As the injury was caused willfully, wantonly, and with actual and common law malice, plaintiff is entitled to punitive damages in an amount to be determined by a court.

**WHEREFORE**, Plaintiff demands judgement against the defendants for plaintiff's First Cause of Action for Libel as follows:

A. A judgment for actual, compensatory and presumed damages against Defendants in an amount to be determined by a court but in no circumstances less than ten-million (10,000,000.00) dollars.

B. Special Damages against Defendants in an amount no less than $200,000.00 representing medical and therapeutic expenses, lost earnings, and physical injury to plaintiff arising from defendant's actions, and

C. Punitive Damages against all defendants in an amount to be determined by the court, and

D. Injunctive relief ordering the removal of the defamatory material in the offending article from the online posting on *The New York Times* website and

E. The costs, fees and disbursements of this action, and

F. For such other and further relief for the plaintiff as the Court deems just, fair and equitable.

Dated: New York, New York
November 18, 2016

David Clifford Holland (Fed. Bar Number DH9718)
The Law Offices of David Clifford Holland, P.C.
155 East 29th Street | Suite 12G
New York, New York 10016
Office 212-842-2480 / Fax 917-591-4555
DCH@HollandLitigation.com

Rodney Alan Smolla (Fed. Bar Number RS8539, pending *Pro Hac Vice* admission)
4601 Concord Pike
Wilmington, Delaware 19803
(302) 477-2278 (office)
(864) 373-3882 (cell)
rodsmolla@gmail.com

Admitted in Illinois and Virginia; Motion to Appear *Pro Hac Vice* to Be Filed

Attorneys for Deidre Chapman